UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MELISSA RUSHING                                              PLAINTIFF

VS.                              CIVIL ACTION NO. 3:18CV511TSL-RHW

MISSISSIPPI DEPARTMENT OF CHILD
PROTECTION SERVICES; JESS DICKINSON,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES;
DANA SPIERS, IN HER INDIVIDUAL CAPACITY;
PAMELA CROSS, IN HER INDIVIDUAL CAPACITY;
TRACY MALONE, IN HER INDIVIDUAL CAPACITY;
AND KRIS JONES, IN HER INDIVIDUAL CAPACITY            DEFENDANTS

MEMORANDUM OPINION AND ORDER

Plaintiff Melissa Rushing was terminated from her employment with defendant Mississippi Department of Child Protection Services (MDCPS) in February 2018. Following her termination, she commenced the present action against MDCPS and MDCPS Commissioner Jess Dickinson, in his individual and official capacities, and against MDCPS employees Dana Spiers, Pamela Cross, Wendy Bryant, Tracy Malone and Kris Johnson, in their individual capacities, for alleged violations of her right to free speech under the First Amendment of the United States Constitution; for wrongful discharge in violation of state law; and for alleged violation of Mississippi's Whistleblower Protection Act, Miss. Code Ann.

§ 25-9-173 *et seq.*[1]  The case is presently before the court on defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has responded to the motion, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that defendants' motion is well-taken and should be granted.

<u>Facts</u>

Rushing first became employed by MDCPS in 2008 as a front-line foster care worker and eventually was assigned to the investigations unit, where she worked investigations and prevention cases.  She left work in early 2016 due to medical issues but was re-employed in November 2016, as a foster care supervisor (Area Social Work Supervisor, or ASWS) in CPS's Pearl River County office.  In that position, she was under the direct supervision of defendant Dana Spiers, Regional Social Work Supervisor, and Pamela Cross, Regional Social Work Director. Defendant Wendy Bryant was Deputy Director of Field Operations-East, whose oversight responsibilities included Pearl River County.

---

[1]   Rushing originally also asserted claims for violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and sections 11 and 13 of Article III of the Mississippi Constitution. She has advised that she is not pursuing these claims.

Rushing's second stint with CPS was marked by ongoing
conflict with her supervisors.  Spiers and Cross regularly
criticized/counseled her for disregarding directives and for
actions (or inaction) which they claimed violated established
protocol and/or CPS policy.  In January 2017, for example, Spiers
counseled Rushing for failing to consult with her before returning
a foster child to the mother's custody (in violation of a protocol
Spiers had recently implemented with Cross's approval) and for her
alleged disregard of safety concerns relating to the placement.
In February, Spiers noted that Rushing had recommended to the
Youth Court that custody be returned to a mother fifty-three days
into a ninety-day trial home visit, in violation of Agency policy.

In March 2017, after Rushing contacted Cross about taking
custody of a child, claiming she had not been able to get in touch
with Spiers, Cross purportedly learned that, in fact, not only had
Rushing been in communication with Spiers via text but also that
she had failed to disclose that the child's grandmother was a
possible placement.  When Cross raised these issues with Rushing,
Rushing reportedly responded that Spiers was on a "power trip" and
said she was going to transfer to another office.

Another incident occurred in March in which Rushing, while
attending a multidisciplinary team meeting, got in a heated verbal
exchange with a sheriff's deputy.  The officer reportedly
complained to Spiers that Rushing was rude and had an attitude.

3

Rushing also complained about the officer's conduct, not only to Spiers, but also to the Pearl River County Youth Court; Judge Richelle Lumpkin, who was later said by Cross to have been outraged, called a meeting between CPS and law enforcement.  Cross advised Rushing that it was not appropriate for her to have addressed this issue to the judge; rather, this was for Spiers and/or Cross to handle, and Rushing had overstepped.

In fact, as reflected in text messages and email exchanges, Cross and Spiers were concerned that Rushing was sharing too much information with Judge Lumpkin.  For example, in April, after the court contacted Spiers to schedule a meeting to discuss concerns over CPS's decision to promote Cory Dedual to a supervisory position as ASWS, Spiers told Cross she suspected Rushing had contacted Judge Lumpkin about Dedual's pending promotion.  Around the same time, after the court had ordered supervised visits with a father and approved a plan for family reunification, Spiers and Cross directed Rushing to change the plan from reunification to "adoption and [durable legal custody] due to aggravated circumstances" and admonished her for failing to read the case history, which reflected that the father had pending felony charges in Hancock County for sexual abuse of his children. Shortly after their discussion, Judge Lumpkin summoned Cross, Spiers and Dedual for a meeting and chastised them for not informing her of the father's pending criminal charges.  Cross

wanted Rushing terminated in connection with this incident.  She reported to Bryant what had transpired, and expressed she was "highly suspicious" that Rushing had shared information with the court about their discussions with her and believed that was why the judge had "blasted" them.  Cross wrote, "I don't trust her, she's very manipulative, & doesn't care whom she hurts to get her way.  Are you sure we can't terminate her instead of a write-up with a review/feedback?"[2]

On May 5, Cross and Spiers verbally counseled her regarding a litany of issues, including but not limited to leaving the office without Spiers' permission; misrepresenting facts (relating to the March custody issue); failing to have regular, scheduled and documented staffings with her workers; and becoming involved in another ASWS worker's case, resulting in the "undoing" of a placement that had been previously worked out by Spiers and the other ASWS.  In a lengthy written (and somewhat sarcastic) response, Rushing maintained she had done nothing that was inappropriate.  She complained that the problem was Spiers, who was routinely absent from work and could not be reached by phone or otherwise.  Rushing maintained that she was a "great leader" who was regularly complimented for doing a "great job" by everyone

---

[2] Rushing contends that Spiers and Dedual were assigned that particular case at the relevant time and that they, not she, were responsible for having approved visitation and reunification. She states that she was concerned about these issues and reported them to the judge.

else and was "tired of constantly being told I'm doing things wrong by" Cross and Spiers.  She closed by asking how to file a formal grievance against Cross and Spiers.  Two days later, Rushing sent an email to the human resources department, under the subject heading "harassment and hostile work environment", complaining she was "having issues" with Cross and Spiers, all because she had "questioned the role of the regional supervisor and the 'protocol' that [Spiers] [had] forced onto the office".  She wrote that Cross had tried to get her discredited with the court (by telling the judge she was a liar) and that under Spiers, she had no freedom; she had to have permission even to go to lunch.

Rushing continued to complain that she was being treated unfairly.  In late May, she sent Cross an email questioning Spiers' choice of ASWS Dedual instead of her to act as Spiers' proxy over investigations while Spiers was out of town, stating:

> I continue to be treated this way.  I am a great supervisor. ...  You keep telling me I'm supposed to trust you, but you continue to show me that you don't trust me in any capacity.  So what is the reason this time?  Is it because I made a compliant [sic] against you and Dana?

In June, Rushing discovered that one of her subordinates, Wenona Mellott, had submitted to CPS a false voucher for payment of hotel expenses.  She questioned Mellott, who admitted the voucher was false and explained she had been directed by Dedual to

6

sign the false voucher.[3]  Rushing confronted Dedual at the Pearl River County Courthouse in the presence of a court-appointed guardian ad litem, Christine Holcomb, whom Rushing had asked to be present as a witness.  When Rushing and Dedual subsequently reported the incident to Spiers, Spiers chastised Rushing for having involved the guardian ad litem as "this was a personnel issue that should never have been discussed with anyone outside of the agency...."  Spiers reported the incident to Cross – the false voucher as well as Rushing's having disclosed private personnel matters to the guardian ad litem.  Cross, in turn, reported it to Bryant, along with a recommendation that Rushing be issued a written reprimand, to be maintained in her personnel file, for "breach of agency security or confidentiality".  Bryant, though, decided on verbal counseling rather than a formal reprimand.  Dedual and Mellott were also counseled for their misconduct.

Meanwhile, Cross reported to Bryant additional issues concerning child safety.  On June 16, she informed Bryant that Spiers had just taken custody of a two-week old from a mother whose other child had been removed due to unstable living conditions.  Cross reported that although the mother was nine months pregnant and still unstable, Rushing had closed the case a

_____

[3]     It appears that Dedual had stayed at the hotel on legitimate CPS business but because she did not want to have to share a room, which CPS policy would have required, she put Mellott's name on the hotel voucher (even though Mellott was not present) so that she could have a room to herself.

few days prior to the infant's birth without consulting Spiers or
Cross.  Reports of continuing domestic abuse following the birth
culminated in CPS's taking custody of the infant.  Cross expressed
to Bryant that if no action was taken to address these issues,
Rushing "will continue to do whatever she wishes, regardless of
policy, practice or safety of children.  She will continue to
think she is untouchable and eventually a child is going to be
hurt or die."  Cross suggested as one option that they could write
up Rushing for insubordination or leaving the work site without
permission, which might cause her to "straighten up for a little
while."  She suggested, as another option, that they could put her
on "special assignment in Hancock County", which would "stop
conduct between Dana & Melissa, get Melissa out of court drama in
[Pearl River], [and] [Hancock County Youth Court] Judge Deano will
not tolerate Melissa's lack of urgency for safety."  She wrote
that "the court in PR might get mad but maybe we can portray it to
Melissa as stevia needed in Hancock."  Cross added that they could
"make her intake ASWS" for both counties, so she would have
"limited case decision making", and noted that by being in Hancock
County, Rushing would "not have information to share with PR
Court."

Bryant evidently determined that no action would be taken at
that time.  However, following a September 27, 2017 incident in
which Rushing failed to timely respond to a report of rape of a

thirteen-year old girl, Cross recommended to Bryant, yet again, that Rushing be suspended pending termination, or that she at least be put on "special assignment as Regional Intake ... to limit her case decision making." Bryant approved the latter request; Rushing was transferred to Hancock County and specially reassigned for ninety days as an intake officer for Pearl River and Hancock Counties, effective October 2, 2017.[4]

In the meantime, in September, prior to her transfer, plaintiff had sent a letter, anonymously, to various state officials – including "the judges, board of social workers, the governor and lieutenant governor, state senators and representatives, and the justices of the supreme court" – expressing concerns that "the workers of Pearl River County Child Protection Services" had relating to "the incompetence of leadership" in the Pearl River County CPS office. This letter, which she titled "A Call to Action", accused supervisors – namely, Spiers, Cross and Dedual – of lying to clients, forging documents, stealing from CPS, and endangering the safety of children by serious neglect of duty.

Following her "special assignment" to Hancock County, Rushing returned to the Pearl River County CPS office but was not

---

[4]     It appears from documents in the record that CPS's human resources department, at this same time, had prepared a notice of termination, which CPS had planned to serve on Rushing.  That plan was evidently abandoned.

permitted to resume her role as supervisor and instead, continued
to perform the intake function.  In late December, Rushing called
and emailed requesting an appointment with Commissioner Dickinson
to discuss concerns that she felt had not been adequately
addressed by Cross, Bryant, or by human resources.  He promptly
returned her call and listened to her concerns, which, as she
subsequently related in a January 3, 2018 email to Commissioner
Dickinson, were that Cross would not let her supervise people and
yet gave less-qualified persons supervisory responsibilities; that
Cross's ostensible concerns regarding her decisionmaking, which
Cross gave as the reason for refusing to return her supervisory
function, were unfounded; and that Cross was requiring her to do
regional work without compensating her for such work.  In this
email, Rushing wrote that Cross, Spiers and Bryant were "covering
up major issues in Pearl River County" and were "continuing to lie
and cover up misdeeds."  Two days later, she sent another email to
Commissioner Dickinson complaining that Cross was being
unreasonable with respect to her job duties, including not
allowing her to supervise workers, and requesting an appointment
to discuss her concerns.  Rushing concluded, stating, "I love
working for this agency but I'm tired of being retaliated against
for whistle blowing on others."

Rushing was discharged on February 22, 2018.  Defendants
maintain in this action that Bryant, with Dickinson's approval,

made the decision to terminate because Rushing, in violation of
CPS policy, had communicated agency matters to persons outside the
agency without authority to do so and because, when questioned
about this communication, had lied and denied having made the
communication.  Specifically, in January or February, Rushing
telephoned Judge Lumpkin and left the following voicemail:

> Hey, Judge Lumpkin, this is Melissa.  If you can, please
> give me a call back.  I just found out, um, Tequila is
> leaving the region entirely.  Um, Pam is pushing state
> office to put Dana back immediately, and my bookkeeper
> is leaving and going to another region too because she
> can't handle it.  So, I just wanted to keep you in the
> loop.  Alright.  Bye.

Judge Lumpkin sent Dickinson an audio copy of this voicemail,
which he, in turn, gave to Bryant to investigate.  Bryant and
Tracy Malone, Deputy Director of Field Operations, called Rushing
and asked whether she had communicated agency personnel matters to
Judge Lumpkin.  According to defendants, she denied leaving the
voicemail and was therefore terminated both for the improper
communication and for her dishonesty.

For her part, Rushing disputes defendants' claim that she was
terminated because of this voicemail, or because she purportedly
lied about the voicemail, a charge which she denies.[5]  Rather, she
contends she was first reprimanded, and then transferred and
demoted, and ultimately fired, in violation of the First

---

[5]    Rushing does not deny that she left the voicemail; she
does deny that she lied about having done so.

Amendment, for engaging in protected speech and/or for
whistleblowing, in violation of the Mississippi Whistleblower
Protection Act; and that she was wrongfully terminated for
reporting her co-workers' criminal activity.  Defendants have
moved for summary judgment on all of these claims.

 <u>Summary Judgment Standard</u>

 Rule 56(a) provides that "[t]he court shall grant summary
judgment if the movant shows that there is no dispute as to any
material fact and the movant is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  On a summary judgment motion,
the moving party must initially "demonstrate the absence of a
genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once the
moving party meets its burden, the burden shifts to the nonmovant,
"who must, by submitting or referring to evidence, set out
specific facts showing that a genuine issue exists" and that
summary judgment should not be granted.  <u>Norwegian Bulk Transp.</u>
<u>A/S v. Int'l Marine Terminals P'ship</u>, 520 F.3d 409, 412 (5th Cir.
2008).  A party opposing a properly supported motion for summary
judgment may not rest upon mere allegations or denials in a
pleading, and unsubstantiated assertions that a fact issue exists
will not suffice.  <u>Celotex</u>, 477 U.S. at 323.  Instead, "the
nonmoving party must set forth specific facts showing the
existence of a 'genuine' issue concerning every essential

12

component of its case." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

In considering a motion for summary judgment, all reasonable inferences to be drawn from both the evidence and undisputed facts are to be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id.

First Amendment

The First Amendment to the United States Constitution protects a public employee's right, under certain circumstances, to speak as a citizen on matters of public concern. Davis v. McKinney, 518 F.3d 304, 311 (5th Cir. 2008) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). The Supreme Court has held that "[e]ven though [individuals] work for the Government, they have not relinquished 'the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.'" United States v. Nat'l Treasury Emp. Union, 513 U.S. 454, 465, 115 S. Ct. 1003, 130

13

L. Ed. 2d 964 (1995).  The law seeks to strike a balance between the interests of an employee, as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs.  Garcetti v. Ceballos, 547 U.S. 410, 420, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (citing Pickering, 391 U.S. at 568, 88 S. Ct. 1731).  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  Id. at 419 (citing Connick v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).

To establish a § 1983 claim for employment retaliation related to speech, "a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."  Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007) (internal quotation marks and citation omitted).

Rushing alleges she experienced actionable retaliation in violation of the First Amendment for engaging in protected speech. Specifically, she contends she engaged in protected speech "when she told the Youth Court about a CPS supervisor's fraud in

14

obtaining a hotel room" and was retaliated against as a direct result.  She further asserts that defendants, in retaliation for her Call to Action letter,[6] transferred her to Hancock County and stripped her of her supervisory function, and ultimately, terminated her.[7]  Plaintiff's First Amendment claim relating to the incident in which she was counseled for discussing confidential personnel matters in the presence of the guardian ad litem fails as a matter of law both because the undisputed facts establish that she did not suffer an adverse employment action as

_____

[6]    In addition to her Call to Action letter, Rushing sent an anonymous letter in the fall of 2017 to the court monitor in Johnson, et al. v. Barbour, et al., 3:04CV251-TSL-FKB (S.D. Miss.), claiming that the "recent report regarding MDCPS workload standards is a fraud."  Defendants have undertaken to demonstrate in their motion that no adverse action was taken against Rushing for having sent this letter.  However, Rushing does not assert, either in her complaint or in her response to defendants' motion, that this letter is a basis for any of her causes of action herein.

[7]    Rushing also vaguely argues she was retaliated against because of "communications with the [Youth Court]", communications which she contends defendants have admitted were protected speech. In this vein, she does point to evidence which suggests that Spiers and Cross were vexed by what they perceived as her constant tattling to the judge about various matters, e.g., Dedual's promotion, the sheriff's deputy's alleged angry outburst, and the sexual assault indictments in the case where the court had ordered reunification.  But other than her putative report of fraud by Mellott and Dedual, Rushing has not identified any specific communication with the Youth Court that would constitute protected speech.  And, contrary to her contention, defendants have not admitted that her communications with the Youth Court amounted to protected speech.  See infra n.10.

a result of such speech and because her speech, considered in context, was not protected.[8]

While "[f]ormal reprimands ... qualify as adverse employment actions and, when given in retaliation for First Amendment activity, are actionable," Colson v. Grohman, 174 F.3d 498, 511 (5th Cir. 1999) (internal quotation marks and citation omitted), the Fifth Circuit has held that "false accusations, verbal reprimands, and investigations [are] not actionable adverse employment actions," id. (internal quotation marks and citation omitted).  Here, Cross did recommend that Rushing receive a formal written reprimand for having involved the guardian ad litem in a private personnel matter, but Bryant rejected that recommendation. As a result, Rushing was only verbally counseled on the importance of maintaining confidentiality of agency personnel matters.  No further action was taken in relation to the incident and nothing was placed in her personnel file to reflect any misconduct or disciplinary action.  In this regard, therefore, she did not suffer an adverse employment action.

Moreover, in the context of this incident, Rushing did not engage in protected speech.  In evaluating whether speech is protected, the court must decide whether the employee spoke as an

---

[8]     It is for the court to "determine whether the employee's speech can be 'fairly characterized as constituting speech on a matter of public concern.'"  Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir. 2001) (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).

employee or as a private citizen.  On this issue, the Supreme Court held in Garcetti that "when public employees [speak] pursuant to their official duties, [they] are not speaking as citizens...."  547 U.S. at 417, 126 S. Ct. 1951.  "Such 'job-required speech is not protected,' even when it irrefutably addresses a matter of public concern."  Anderson v. Valdez, 845 F.3d 580, 593 (5th Cir. 2015) (quoting Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692-93 (5th Cir. 2007)).  Interpreting this requirement, the Fifth Circuit has held that "a public employee's speech is made pursuant to his official duties when that speech is made 'in the course of performing his employment,' whether or not that speech was specifically demanded of him."  Id. at 595 (quoting Williams, 480 F.3d at 694).  In determining whether speech was made as a private citizen or in the course of a public employee's job duties, courts consider the employee's job description, whether the speech concerned the speaker's employment, whether the speech was made internally or to an external party or entity, and whether the speech stemmed from special knowledge gained by virtue of employment with a public entity.  See Elizondo v. Parks, 431 F. App'x 299, 303 (5th Cir. 2011) (per curiam).  Where "a public employee raises complaints or concerns up the chain of command at his workplace about his job duties", those complaints and concerns are made in accordance with one's job duties.  Davis, 518 F.3d at 313.  Importantly, when

17

determining whether speech is protected, the court's primary focus is not the content of the speech but "the role the speaker occupied when he said it". Benes v. Puckett, 602 Fed. Appx. 589, 593 (5th Cir. 2015) (per curiam)(citing Garcetti, 547 U.S. at 420-21, 126 S. Ct. 1951).

Although it was not Rushing's job to ferret out fraud or misconduct, once she became aware that her subordinate had participated in the submission of a fraudulent travel voucher, she was duty-bound to address and report the issue. Clearly, had she questioned Mellott and Dedual about the false travel voucher without involving the guardian ad litem, her speech would not be protected, notwithstanding that it may have been on a matter of public concern.[9] Rushing argues, though, that what was protected was her report of Mellott's and Dedual's misconduct "to the court" or "Youth Court officials", i.e., to the guardian ad litem. Her premise is mistaken, however, for contrary to Rushing's characterization, her confronting Mellott and Dedual with the guardian ad litem present cannot reasonably be said to have been a report of anything to the court or court officials. Guardians ad litem are private individuals appointed by a court to represent the best interests of children, see Miss. Code Ann. § 43-21-121;

---

[9] Cf. Anderson v. Valdez, 845 F.3d 580, 599 (5th Cir. 2016) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of ... officials, in terms of content, clearly concerns matters of public import.") (internal quotation marks and citation omitted).

they are not "court officials", cf. Cokley v. Barriga, No. SA-14-CV-945-XR, 2014 WL 5469834, at *2 (W.D. Tex. Oct. 28, 2014) ("Courts have ... [held] that guardians and attorneys ad litem are not state actors merely by their positions or because a court appoints them.") (citing cases). Furthermore, Rushing's purpose in requesting the guardian ad litem's presence was not to report misconduct of CPS employees to the court, or for that matter, even to the guardian ad litem. Rather, she wanted the guardian ad litem to be present solely to witness her conversation so that no one could later misrepresent anything she said. According to Rushing, because Cross and Spiers had a history of treating her unfairly, including by falsely accusing her of misrepresenting facts, she asked the guardian ad litem to be in the room when she questioned Mellott and Dedual because she "needed a witness to the situation at hand" and "thought of [the guardian ad litem] as a neutral person"; there had "been a lot of tension and miscommunication in our office", she stated, and she "didn't want this too to be miscommunicated."  By her own admission, then, her singular interest in having the guardian ad litem present was her personal interest in protecting her own employment.  Her speech, in this context, was not as a citizen but rather as an employee and hence was not protected under the First Amendment.

Rushing next asserts that she was transferred and demoted (by being stripped of her supervisory duties), and was eventually

19

terminated, in retaliation for the Call to Action letter she sent
to various public officials in September 2017.  For purposes of
their motion, defendants do not deny that the Call to Action
letter constituted protected speech, nor do they deny that
Rushing's interest in commenting on the matters of public concern
in that letter outweighed CPS's interest in promoting efficiency.[10]
They contend, though, that Rushing's First Amendment claim based
on the letter fails on the causation element.[11]  She cannot sustain
her burden to show that the letter precipitated any adverse
employment action, they argue, because the uncontroverted record
evidence establishes that, in fact, no defendant was actually
aware that she was the author of this letter until after she
commenced this litigation.

Rushing did not sign the Call to Action letter; she sent it
anonymously.  She did not send it to Bryant, who made the final

---

[10]     Defendants have conceded only that for purposes of this
motion, *the Call to Action letter* constituted or contained
protected speech and that plaintiff's interest in commenting on
the matters set forth in this letter outweighed the Agency's
interest in promoting efficiency.  Although Rushing purports to
believe otherwise, defendants have not conceded that she otherwise
engaged in protected speech.

[11]     Defendants have also argued that transfer was merely
"administrative" and was not an adverse employment action.
Clearly, however, given that she was relieved of her supervisory
duties, there is at least an issue of fact as to whether this was
a demotion and hence an adverse employment action.  See Serna v.
City of San Antonio, 244 F.3d 479, 483 (5th Cir. 2001) (adverse
employment action includes discharge, demotion, refusal to hire or
promote, or reprimand) (citations omitted).

transfer/demotion decision, but she did send it to Dickinson, who gave a copy to Bryant.  Bryant recalled that she saw the letter in September, prior to the transfer.  However, she testified she did not learn Rushing had written the letter until after this case was filed.  Dickinson, who participated with Bryant in the termination decision to the extent he approved the decision, likewise stated that he did not know Rushing authored the letter until she filed this lawsuit.[12]

Rushing suggests that Dickinson could have known she wrote the letter inasmuch as she put her name and return address on the envelope; yet there is no evidence that he ever saw the envelope. Further, she argues that Bryant, after reading the letter, easily could have "put two and two together" to conclude that Rushing authored the letter, and that a jury could reasonably find that

---

[12]     Rushing has acknowledged that under applicable Fifth Circuit law, all but the final decisionmakers have qualified immunity.  See Sims v. City of Madisonville, 894 F.3d 632 (5th Cir. 2018) (since "public officials are subject to section 1983 liability only if their actions were objectively unreasonable in light of clearly established law at the time of the violation" and since inconsistency in Fifth Circuit law on whether First Amendment liability could attach to a public official who did not make the final employment decision was previously unresolved, then persons other than final decisionmakers were entitled to qualified immunity).  Here, the evidence shows that although Cross came up with the idea to transfer/demote Rushing – which she did before Rushing sent the Call to Action letter – Bryant made the final decision.  Moreover, the decision to discharge Rushing was also made by Bryant, with Dickinson's approval.  Thus, while all the defendants have provided sworn testimony, by deposition and by affidavit, that they did not learn that Rushing wrote the Call to Action letter until after this suit was filed, the only pertinent testimony on this issue is that of Bryant and Dickinson.

she did so.  But even if Bryant could have, or even should have been able to figure out that plaintiff wrote the letter, Rushing has offered no evidence from which it could be inferred that Bryant actually did "put two and two together" at any time before the challenged employment decisions.  Accordingly, for the foregoing reasons, the court concludes that defendants are entitled to summary judgment on Rushing's First Amendment retaliation claim.

    <u>Whistleblower Protection Act</u>

    Rushing alleges she was subjected to retaliation "for providing information to a state investigative body, and/or for being a whistleblower", in violation of Mississippi's Whistleblower Protection Act, Miss. Code Ann. § 25-9-171, *et seq*. More particularly, she contends she was transferred/demoted and then discharged in retaliation for sending the Call to Action letter.  The Whistleblower Protection Act provides a cause of action to one who has been "subjected to workplace reprisal or retaliatory action" "as a result of being a whistleblower".  Miss. Code Ann. § 25-9-173(2); <u>see also</u> <u>id</u>. § 25-9-175 (providing remedies, including back pay and reinstatement, compensatory damages, court costs and attorney's fees).  The Act defines "whistleblower" as "an employee who in good faith reports an alleged improper governmental action to a state

investigative body, initiating an investigation." Miss. Code. Ann. § 25-9-171(j).

Defendants argue that Rushing does not qualify as a "whistleblower" and is not entitled to the protections of the Whistleblower Protection Act because she did not send the subject letter to a "state investigative body", as that term is defined in the Act,[13] and because the letter did not actually result in the initiation of an investigation, as defendants submit is required by the Act. Rushing disputes defendants' interpretation of the Act's requirements and insists that she fits comfortably within the definition of whistleblower.[14] But even if she were a

_____

[13] "State investigative body" is defined as "the Attorney General of the State of Mississippi, the State Auditor, the Mississippi Ethics Commission, the Joint Legislative Committee on Performance Evaluation and Expenditure Review or any other standing committee of the Legislature, or any district attorney of the State of Mississippi." Miss. Code Ann. § 25-9-171(j). "Improper governmental action" is defined as "any action by an employee which is undertaken in the performance of the employee's official duties, whether or not the action is within the scope of the employee's employment... [w]hich is in violation of any federal or state law or regulation, is an abuse of authority, results in substantial abuse, misuse, destruction, waste, or loss of public funds or public resources...." Id. § 25-9-171(d)(I).

[14] If, in order to decide defendants' motion, it were necessary for this court to resolve the issues of statutory interpretation raised by the parties, this court would exercise its prerogative to dismiss plaintiff's claim without prejudice pursuant to 28 U.S.C. § 1367(c), inasmuch as this court has already determined that plaintiff's sole federal claim should be dismissed and also because such a dismissal would allow for interpretation of these state statutory provisions by state courts. See 28 U.S.C. § 1367(c)(3) (providing that district courts may decline to exercise supplemental jurisdiction over a claim if the claim raises a novel or complex issue of State law or

whistleblower, as defined by the Act, she would still have to prove, in order to secure relief, that her termination or other adverse action taken against her was a "direct result of providing information to a state investigative body". <u>Moffett v. Miss. Dep't of Mental Health</u>, 507 F. App'x 427, 433 (5th Cir. 2013) (quoting Miss. Code. Ann. § 25-9-173). Rushing has no such proof. As the court has concluded *supra*, in the face of defendants' evidence, she has failed to come forward with sufficient evidence to create a genuine issue of material fact as to any defendant's alleged awareness of her authorship of the letter. Accordingly, summary judgment will be granted on this claim.

McArn Wrongful Discharge

Rushing alleges in her complaint that she was terminated for reporting a crime, specifically, Mellott's and Dedual's attempt to defraud CPS by submitting a false travel voucher. Rushing was indisputably an at-will employee. <u>See</u> Miss. Code. Ann.

---

the court has dismissed all claims over which it has original jurisdiction); <u>see also</u> <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966) (stating that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); <u>Garrett-Woodberry v. Miss. Bd. of Pharmacy</u>, No. CIVA 307CV4 DPJ-JCS, 2008 WL 872444, at *4 (S.D. Miss. Mar. 27, 2008), <u>aff'd</u>, 300 F. App'x 289 (5th Cir. 2008) (quoting <u>Gibbs</u> and dismissing, pursuant to § 1367(c)(3), claim for violation of Mississippi Whistleblower Protection Act, the relevant portions of which "[had] not been explored by Mississippi courts").

§ 25-9-127(1)&(7) (providing that statutory protection for certain state employees from dismissal "except for inefficiency or other good cause" "shall not apply to the personnel actions of [MDCPS]" and that "all employees of the department shall be classified as nonstate service...."). In general, at-will employees in Mississippi may be terminated "for good reason, bad reason, or no reason at all...." Galle v. Isle of Capri Casinos, Inc., 180 So. 3d 619, 622 (Miss. 2015) (internal quotation marks and citations omitted). However, in McArn v. Allied Bruce-Terminix Co., Inc., 626 So. 2d 603, 607 (Miss. 1993), the Mississippi Supreme Court carved out a narrow public policy exception to the at-will doctrine, holding that an employee who is discharged for refusing to participate in an illegal act or for reporting illegal acts of his employer to the employer or anyone else may bring an action in tort against the employer.[15]

In their motion, defendants initially argued that Rushing's McArn claim failed as a matter of law because her report(s) of criminal activity related to alleged criminal activity of co-workers, Mellott and Dedual, not of her employer, CPS. They have since acknowledged that this position lacks merit in light of the

---

[15]   Only the employer may be liable for wrongful discharge under McArn. DeCarlo v. Bonus Stores, Inc., 989 So. 2d 351, 359 (Miss. 2008) ("the McArn-created exceptions were intended only to impose liability on the employer and not on individual defendants who are acting in the course and scope of their employment when participating in the discharge giving rise to the retaliatory discharge claim.").

25

Mississippi Supreme Court's holding in <u>DeCarlo v. Bonus Stores,</u>
<u>Inc.</u>, 989 So. 2d 351, 352 (Miss. 2008), that "a retaliatory
discharge claim for discharge in retaliation for reporting a
co-employee's illegal acts that relate to the employer's business."
Still, defendants maintain in their rebuttal that they are entitled
to summary judgment on this claim, but for different reasons,
namely, that Rushing did not actually "discover the issue" of
Melott's and Dedual's fraud herself – she only saw the documents
because they were lying on the bookkeeper's desk; and, she "did not
truly report [the alleged fraud] to a supervisor so MDCPS could
investigate and handle the episode" but instead just confronted
Dedual about it.  Neither position has merit.  First, under the
<u>McArn</u> exception, there is no requirement that Rushing have
"discovered the fraud" herself in order to have protection for
reporting it.[16]  Moreover, plaintiff did not merely confront Mellott
and Dedual; she also reported their apparent fraud to her
supervisor, Spiers, who in turn reported it to defendants Cross and
Bryant.  Mellott and Dedual were disciplined as a result.

Nevertheless, Rushing cannot succeed on her <u>McArn</u> wrongful
discharge claim because the evidence, construed in the light most
favorable to her, does not support a reasonable finding that she

---

[16]    In any event, there is ample evidence to suggest that,
in fact, Rushing was the one who discovered the fraud.  The
bookkeeper may have had possession of the fraudulent travel
voucher but that does not mean that she realized the claim was
fraudulent.  Plaintiff on the other hand, clearly did.

was terminated for reporting Mellott's and Dedual's alleged criminal activity.   Rushing twice reported their alleged fraud, first to Spiers on the same day she confronted Mellott and Dedual, and a few months later, in her Call to Action letter.   As discussed at length and repeatedly *supra*, however, Rushing has come forward with no evidence to show that defendants (in particular Bryant or Dickinson, who made the discharge decision), knew she had written the anonymous letter.   And although Bryant was timely informed of Rushing's report of the fraud to Spiers in June 2017, a jury could not reasonably find that Bryant terminated her employment some eight months later for having done so.   The evidence shows that Cross and Bryant thought disciplinary action was warranted, not because Rushing reported Mellott's and Dedual's alleged fraud but because she discussed the matter in the presence of the guardian ad litem.   There is no evidence to suggest that CPS wanted to conceal or cover up the alleged fraud or that anyone at CPS thought Rushing had acted improperly or was displeased with her for having brought their fraud to light.

In her response brief, Rushing submits an alternative theory in support of her wrongful discharge claim, namely, that she was fired in violation of <u>McArn</u> for reporting in emails to Dickinson that she had been the victim of the crime of retaliation.   In this regard, Rushing points to Mississippi Code Annotated § 97-9-127(1), which states:

> A person commits the offense of retaliation if he
> intentionally or knowingly harms or threatens to harm
> another by any unlawful act in retaliation for anything
> lawfully done in the capacity of public servant, witness,
> prospective witness or informant.

Miss. Code. Ann. § 97-9-127.  Rushing's communications with Dickinson on which she purports to base this claim cannot reasonably be construed as the report of criminal activity.  In substance, Rushing merely complained that she felt Cross was being unfair and "unreasonable" in refusing to allow her to supervise employees and in not compensating her for the regional duties she was required to perform.  This was no crime.  Rushing did mention being tired of being "retaliated against" for "whistle blowing on others."  But she did not elaborate; and these vague references cannot reasonably be said to be a report of illegal acts.  Her claim thus fails as a matter of law.

<u>Conclusion</u>

Based on all of the foregoing, it is ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 13th day of January, 2020.


/s/ Tom S. Lee_____
UNITED STATES DISTRICT JUDGE